# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY N. MCKENZIE,<br><br>              Plaintiff,<br><br>     vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>              Defendant.<br>_____/ | Case No. 08-cv-1783-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING THE ENTRY OF JUDGMENT FOR DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF HARRY N. MCKENZIE |

## BACKGROUND

Plaintiff Harry N. McKenzie ("Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). Pending before the Court is Plaintiff's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). On November 14, 2008, Plaintiff's complaint was filed in the United States District Court for the Eastern District of California. (Doc. 1). Plaintiff filed his opening brief on July 15, 2009. (Doc. 14). The Commissioner filed his opposition brief on August 18, 2009. (Doc. 15). Plaintiff filed a reply brief on September 1, 2009. (Doc. 16).

# FACTS AND PRIOR PROCEEDINGS[1]

On May 2, 2006, Plaintiff filed applications for DIB and SSI benefits under Title XVI of the Act. AR at 113, 116. Plaintiff alleged in each application that he had been under a disability since April 1, 2005. Id. After initial denial of his request for benefits by the Agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 8. On April 21, 2008, the ALJ held a hearing, and on June 21, 2008 denied benefits. Id. at 12-25. Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Id. at 25. On September 8, 2008, the Appeals Council denied review. Id. at 5-7.

<u>Hearing Testimony</u>

Plaintiff testified he was born on September 12, 1970. AR at 35. He stated he lived with his friend and his friend's girlfriend. Id. at 36. Plaintiff stated he didn't have a driver's license because it was suspended in 2000 following a DUI. Id. He reported that since the suspension, he either walked to where he was going or was driven places by his friend. Id.

Plaintiff completed the 12th grade but stated it was "special ed." AR at 37. He stated he could read English but couldn't understand what he read. Id. Likewise, he stated if he read a newspaper he couldn't understand it and had to ask others to explain. Id. at 38. When he used to drive he could only read the street signs "a little." Id. at 37. He explained that he could write but he had difficulty spelling and would get "mixed up." Id. at 38.

Plaintiff testified he last worked in 2006 as a busboy. AR at 38. He stated this was part time work for 5 hours a day, 1 day a week, and obtained this work through a temp agency. Id. He estimated he worked on this job about two-to-three months. Id. at 39. He stated he worked for this temp agency from 2001 through 2005. Id. He contended he did other part-time work with the temp agency including laboring work that involved "sweeping." Id. at 40. He contended he did not work more hours while at the temp agency because of his "problems." Id. In particular, he stated that others had trouble understanding his speech and he would get in trouble for being in a daze and talking to himself. Id. at 39-40. Eventually the temp agency let him go. Id. at 40

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

Plaintiff stated he worked as a security guard at a small shopping center in Fresno for about six months.[2] AR at 41. He claimed his was let go from that job because his supervisors couldn't understand his writing. Id. He explained that this job required him to write reports and because he couldn't spell and write legible "incident reports" his supervisors got frustrated. Id. at 42.

Plaintiff reported he did yard and "inventory" work on a part-time basis for about three months also. AR at 42. He stated that he couldn't get full-time work in the inventory job because he couldn't swipe things through a machine fast enough. Id. at 43. Because he couldn't perform this function he testified that he was let go from that job altogether. Id.

Before the inventory job, Plaintiff testified that he worked for about two months at a car wash. AR at 43. Before that, he stated he worked for a bit longer period at another car wash. Id. at 44. These jobs required him to lift buckets and vacuum cleaners. Id. He stated he was dismissed from these jobs because he couldn't do the work properly. Id.

Prior to that, Plaintiff reported that he worked as a busboy in Reno, Nevada and also washed dishes. AR at 45. He claimed he did this work for only about two-to-three months and was let go because he got hurt. Id.

Plaintiff reported that he had trouble concentrating and focusing. AR at 54. He stated that he had trouble focusing even for a minute because he felt he needed to "stay moving." Id. He did not believe he could concentrate on one thing for 30 minutes at a time, or even for 15 minutes. Id. He estimated that he might be able to concentrate on one thing for five minutes. Id. at 55. As to his current income, Plaintiff testified that he received "general relief" benefits and food stamps but that he had no other income. AR at 62.

Plaintiff reported that he didn't cook but could fix himself cereal. AR at 60. He claimed he couldn't wash dishes because he would break them. Id. at 61. He stated he couldn't do laundry because he had trouble measuring and putting in soap. Id. He reported he cleaned his room and picked up his clothes. Id. at 61-62. He stated he raked the yard but didn't know how to mow. Id. at 62. Plaintiff testified that he had no particular hobbies or interests. AR at 58. He stated he didn't

---

[2] It is not clear from his testimony if he obtained this work through the temp agency or if it was work he did prior to his employment with the agency.

3

really do anything for fun and didn't go anywhere. Id. at 58-59. He didn't play any sports. Id. at 59. Every month or so he visited an aunt in Fresno. Id. He liked to watch "Boondocks" on television. Id.

Plaintiff testified that he couldn't work full-time because of depression. AR at 46. He claimed he was often depressed on a daily basis. Id. at 47. In addition, he asserted that he "hears things." Id. He stated that his depression effected his ability to do anything and made him want to stay in his room. Id. at 47-48. He estimated he stayed in his room on average between 5-7 hours a day and listened to music. Id. at 48. If he talked to a friend, this made him feel better. Id. at 48.

Plaintiff maintained that nothing really excited him. AR at 49. He stated that he cried often and occasionally felt suicidal. Id. at 49-50. He contended that on one occasion he attempted to kill himself by jumping off a bridge but was stopped by a friend. Id. at 50. He claimed that after this attempt he spent several days in a hospital. Id. at 51. He stated that since then if he had suicidal thoughts he would either talk to a friend or possibly his psychiatrist, Dr. Banerjee. Id.

Plaintiff testified he took medication for his depression. AR at 51-52. He stated that these medications made him sleepy and caused him to have to lie down for a couple of hours each day. Id. at 52. He reported that the medications prescribed to him helped him feel better "sometimes" but he still wanted to be alone. Id. at 53.

Plaintiff described hearing voices of dead relatives, including his uncle, aunt and cousin. AR at 55. He testified that no one else heard these voices. Id. He claimed he heard voices approximately once each day for a period that he estimated lasted between 20 and 60 minutes. Id. at 57. He stated that the voices told him what kind of day he would have. Id. at 56. Sometimes he listened to the voices but he also tried to ignore them. Id. He stated that the medications he took "sometimes" helped him ignore the voices. Id.

Plaintiff stated that during the period of time he was being treated for his depression by Dr. Archana Banerjee, a psychiatrist at the Fresno County Health Services Agency. He testified that sometimes he was able to talk to Dr. Banerjee between scheduled appointments and believed that this helped him. AR at 60.

Vocational expert ("VE") Shapiro testified at the hearing. AR at 63. He described Plaintiff's

past work as a security guard, busboy, hand packager, dishwasher/kitchen helper, commercial institutional cleaner, stores/warehouse laborer and automobile washer. Id. at 64. He described the busboy, hand packager, dishwasher and stores/warehouse laborer positions as medium and unskilled. Id. He described the security guard position as light and semi-skilled. Id. He characterized the commercial/institutional cleaner work as heavy and unskilled. Id.

In his first hypothetical, the ALJ described a person of Plaintiff's age, education and work experience who was capable of understanding, remembering and carrying out simple one or two-step job instructions. AR at 64. The VE opined that such a person could perform Plaintiff's past relevant work as a commercial or industrial cleaner. Id. at 64-65. In addition, he described other work in the state and national economy that such a person could perform, in particular that of poultry offal icer, termite exterminator helper and brush clearing laborer. Id. at 65.

In a second hypothetical, the ALJ again described a person of Plaintiff's age, education and work experience but who could not complete an eight-hour workday "without interruption from psychologically based symptoms." AR at 65. The VE opined that such a person could do none of Plaintiff's past relevant work or any other work. Id. at 65-66.

Relevant Medical Record

Notes from a mental health examination conducted on Plaintiff by Dr. Richard Engeln, Ph.D., indicated numerous testing of Plaintiff's psychological condition including the Wechsler Adult Intelligence Scale III, Wechsler Memory Scale III, Bender-Gestalt II, and Trails A and B. AR at 207. In addition, Dr. Engeln administered the Rey 15 Item Memory Test II ("Rey") and a test for Memory and Malingering ("TOMM"). Id. at 208.

Dr. Engeln noted that Plaintiff's Department of Social Services Packet alleged depression and that he was a slow learner. AR at 207. In his evaluation, Dr. Engeln noted that Plaintiff was alert and oriented with no evidence of delusions, hallucinations or confusion. Id. at 208. He described Plaintiff as easily understood and appropriate in form and association. Id. Plaintiff arrived with his girlfriend who answered Dr. Engeln's initial questions for Plaintiff. Id. Dr. Engeln found that Plaintiff displayed an unwillingness to exert any effort on tasks presented to him and noted that the Rey and TOMM tests were positive for exaggeration. Id.

Dr. Engeln determined that Plaintiff's interview presentation indicated intellectual functioning in the high mild range of mental retardation to low borderline. AR at 208. His verbal and visual intellectual measurements indicated a moderate range of mental retardation. Id. Dr. Engeln reported the following IQ estimates: Verbal = 58; Performance = 53; Full Scale = 51. Id. He reported that the Bender-Gestalt II test indicated a copy phase, performance standard and recall phase in the borderline range. AR at 209. A Wide Range Achievement Test R for academic skills found Plaintiff's reading skills measured at mid second grade level, his spelling skills at beginning second grade level and his arithmetic skills at end pre-first grade level. Id. Plaintiff successfully completed the Trails A test for 1 - 17 but rejected the Trails B test as too difficult. Dr. Engeln concluded that the test findings were underestimates of his actual abilities. See id.

Dr. Engeln concluded that Plaintiff displayed no evidence of mental or emotional illness and no evidence of organically related mental retardation issues. AR at 209. He found Plaintiff was unwilling to demonstrate the full array of his competency. Id. He noted that Plaintiff's interview presentation suggested intellectual functioning at a higher level (high mild range of mental retardation to low borderline) than the testing measurements for his verbal and visual intellectual functioning (moderate range of mental retardation) and reiterated the positive finding for exaggeration on his Rey and TOMM tests. Id.

Dr. Engeln diagnosed an "exaggerated protocol" and stated that Plaintiff appeared competent to handle his own funds. AR at 209-10. Because of the finding of exaggeration, Dr. Engeln couldn't identify Plaintiff's actual abilities. Id. at 210. Dr. Engeln concluded that Plaintiff appeared verbally, cognitively and socially capable of job adjustment in the entry-level context where instructions were simple and unidimensional with normal supervision. Id. He believed Plaintiff was capable of performing repetitive tasks and following one and two-step simple job instructions that were not complex or technical. Id. However, he believed Plaintiff would have difficulty in jobs where demands were constantly changing. Id.

In September, 2006, a non-examining state agency physician, Dr. H.R. Warren, completed a Mental Residual Functional Capacity Form. AR at 216. Dr. Warren reviewed Plaintiff's records, including Dr. Engeln's findings. In his Mental RFC Assessment, Dr. Warren found Plaintiff not

significantly limited in most categories of function such as the ability to understand and remember short and simple instructions and the ability to work in proximity to and coordination with others. Id. However, Dr. Warren found Plaintiff "moderately limited" in some areas, including his ability to understand and remember detailed instructions, maintain concentration for extended periods and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 216-17. Nevertheless, Dr. Warren concluded that Plaintiff was capable of understanding and remembering simple instructions, maintaining attention and concentration for at least 2 hours at one time, could relate appropriately with peers and supervisors and was capable of adapting to routine workplace changes. Id. at 218. Noting Dr. Engeln's findings, Dr. Warren agreed that Plaintiff's claims concerning depression/slow learning were not fully credible and exaggerated and cited Dr. Engeln's testing. Id. at 221, 234. He also agreed that Plaintiff likely functioned in the low borderline-high mild retardation level. Id. at 234.

Dr. Elizabeth Muro, another non-examining state agency physician, filled out a Mental RFC assessment in October 2006. Her findings were virtually identical to Dr. Warren's. AR at 236-38. She concluded that Plaintiff was capable of performing simple, repetitive tasks, that he could complete an 8-hour workday and was capable of adapting and relating in such settings. Id. at 238.

Plaintiff was treated regularly between August 2006 and January 2007 by Dr. Banerjee at the Fresno County Health Services Agency. See AR at 239-260. In progress notes from an August, 2006 examination, Dr. Banerjee diagnosed Plaintiff with major depressive disorder with no psychosis and prescribed medication, including Rameron. AR at 259-60. She documented a Global Assessment of Functioning ("GAF") score of 55.[3] She described Plaintiff's mood as "depressed" but found him alert and attentive. Id. at 258. She attributed his depressive demeanor to multiple deaths in his family in recent years and to having lost a job. Id.

---

[3] The GAF measurement (based on a scale of 0 to 100) represents a clinician's judgment of an individual's overall level of mental functioning. See Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). A GAF of 55 falls within the category of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See id. at 34.

7

Plaintiff told Dr. Banerjee he had not received any previous psychological treatment or hospitalization but qualified this by noting his recent examination by Dr. Engeln. AR at 257. In progress notes from October 12, 2006 and October 24, 2006, Dr. Banerjee reiterated her diagnosis. AR at 253, 250. December 6, 2006 progress notes documented Plaintiff describing mild improvement in his depression. Id. at 244. Plaintiff described hearing voices of family members in his sleep. Id. Dr. Banerjee reiterated her diagnosis of major depressive disorder. Id.

In notes from January 10, 2007, Dr. Banerjee again diagnosed major depressive disorder and noted Plaintiff described no significant improvement. AR at 241. Plaintiff was accompanied by a woman identified by Dr. Banerjee as his wife. Id. She described Plaintiff's condition as only mildly improved. Id. Dr. Banerjee documented a GAF score of 45.[4]

Later progress notes by Dr. Banerjee from sessions in February, May and June 2007, documented major depressive disorder but with psychosis. AR at 270, 272, 273. In these exams, Dr. Banerjee calculated a GAF score of 40.[5] See id. Dr. Banerjee noted that Plaintiff described his depression as about the same, that he continued to hear voices "off and on" and mostly stayed at home. Id. Throughout this period Plaintiff was treated with several medications including, Martazapine, Risperdal and Prozac. See id.

In March 2007, non-examining physician, Dr. Evangeline Murrillo, reviewed Plaintiff's mental health records. Dr. Murrillo noted Plaintiff's treatment history, including Dr. Engeln's August 2006 findings, and questioned Plaintiff's credibility concerning his level of functioning in light of testing (the Rey and TOMM tests) showing positive for exaggeration. AR at 261. She concurred with previous mental functioning assessments indicating that Plaintiff retained the ability to perform simple, repetitive tasks. Id. at 262.

In August 2007, Plaintiff began treatment at the Fresno clinic with Dr. Robert Ensom. In an

---

[4] A person with a GAF of 45 is described in the DSM-IV as having serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

[5] The DSM-IV describes a GAF score of 40 as indicating an individual with some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school). DSM-IV at 34.

August 2007 exam, Dr. Ensom, like Dr. Banerjee, diagnosed Plaintiff with depressive disorder as well as psychotic disorder and mental retardation of "unspecified severity." AR at 269. He prescribed several medications including: Invega, Remeron, Prozac and Cogentin (for muscle jerks). Id. Dr. Ensom also documented a GAF score of 5. Id.

Dr. Ensom noted that Plaintiff arrived for the appointment with his girlfriend and recounted that he was "sometimes" depressed. AR at 269. He recounted that he stays in his room more and continues to hear voices of dead relatives. Id. Dr. Ensom noted that neither Plaintiff nor his girlfriend provided much background information because Plaintiff was unable to do so and the girlfriend was unsuccessful in eliciting this information from him. As a result, Dr. Ensom reported that it was difficult to make a clinical assessment. Id.

In progress notes from September 2007, Dr. Ensom recounted the same diagnosis as in August, and documented adding an additional medication, Zyprexa. AR at 267. Plaintiff recounted that he "hears and sees monkeys" that talk and make monkey sounds. Id. His girlfriend told Dr. Ensom that she heard Plaintiff talking to voices. Id. Plaintiff recounted that sometimes he sleeps well but other times not well. Id. Dr. Ensom reaffirmed a GAF score of 5. Id.

Dr. Ensom's next progress notes indicated that Plaintiff arrived three hours early for an appointment on March 10, 2008. AR at 266. However, he left prior to the actual appointment time, telling Dr. Ensom's assistant that he had another appointment. Id.

ALJ Findings

The ALJ first determined that Plaintiff met his insured status through September 30, 2009. AR at 17. The ALJ then evaluated Plaintiff pursuant to the customary five-step sequential evaluation. After determining that Plaintiff had not engaged in substantial gainful activity since her claimed onset date of April 1, 2005 (Step 1), the ALJ found (Step 2) that Plaintiff had the following severe impairment: borderline intellectual functioning . Id. However, this impairment did not meet or exceed the level required under Agency guidelines for presumed disability (Step 3). Id.

In the fourth step of his analysis, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but could understand, remember, and carry out only simple one- or two-step job instructions. AR at 18. Based

9

on this RFC finding, the ALJ concluded that Plaintiff retained the ability to perform his past relevant work as a commercial or institutional cleaner or cleaner II (Step 4). Id. at 24. Alternatively, the ALJ concluded that Plaintiff retained the RFC to perform other work in the state and national economy (Step 5) including "heavy, unskilled occupations" such as poultry offal icer, termite exterminator helper and brush-clearing laborer. Id. at 24-25. As a result, the ALJ determined that Plaintiff was not disabled as defined by the Act. Id. at 25.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See* Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, *inter alia*, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[6] As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) had a medically determinable and severe impairment, to wit, borderline intellectual functioning; (3) did not have an impairment which meets or is equal to one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could perform his past work as a commercial or institutional cleaner or cleaner II; and (5) retained the RFC to perform other work related activities including poultry offal icer, termite exterminator helper and brush-clearing laborer. AR at 17-18, 24-25. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 25.

Plaintiff challenges the ALJ's determination at Steps 4 and 5 of the sequential evaluation process, where an individual's ability to perform work is assessed based on her RFC.

### DISCUSSION

The Court discerns Plaintiff as raising three issues on appeal. First, he contends the ALJ failed to properly credit the opinions of a non-examining consulting physician, Dr. Warren, in finding that Plaintiff retained the RFC to perform work. (See Doc. 14 at 8-10). Second, he asserts that the ALJ erred in failing to specifically relay Plaintiff's mental status, in particular, his borderline/mental retardation, in the hypotheticals he posed to the VE. (Id. at 10). Finally, it appears that Plaintiff raises a more generalized claim alleging that the ALJ's finding of not disabled was not supported by substantial evidence and that the ALJ improperly discounted the opinions of certain treating physicians, in particular Dr. Ensom. (See id. at 8-10.)

A. The ALJ Properly Considered the Opinion of Dr. Warren in Concluding that
Plaintiff Retained the RFC to Perform Work and Was Not Disabled

---

[6] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

11

In his Mental RFC Assessment of September 30, 2006, Dr. Warren found that Plaintiff was "moderately limited" with respect to his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." AR at 217. At the administrative hearing, in the second hypothetical the ALJ asked the VE to assume a person of Plaintiff's age, educational background and work experience who could not "complete an eight-hour workday without interruption from psychologically based symptoms." Id. at 65-66. The VE stated that such a person could perform no work. Id. at 66.

Plaintiff appears to contend that in light of Dr. Warren's conclusion, the ALJ should have adopted a RFC finding based upon the second hypothetical posed to the VE and should have accepted the VE's opinion that a person with these restrictions could not work. (See Doc. 14 at 9). Plaintiff cites no case law to support his argument. Conversely, Defendant's cite McArthur v. Astrue, 2008 WL 802327 (E.D. Cal. March 24, 2008) to refute this contention. In McArthur, the court held that despite findings of "moderate limitations" with respect to a claimant's ability to "maintain concentration, persistence or pace," a finding of disabled is not mandated, particularly where, as in this case, the doctor's findings conclude that the claimant maintains the RFC to perform simple, repetitive tasks despite these limitations. See id. at *7-8. As the court noted, in determining a claimant's RFC at Step 4, the purpose is to ascertain what a claimant is capable of doing despite his limitations, not the degree and nature of his limitations (which are ascertained at Steps 2 and 3). See id. at *7 (citing 20 C.F.R. § 404.1545(a)). This view was also adopted by the Ninth Circuit later in Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008) (a RFC finding that a claimant was limited to simple, routine and repetitive work was sufficient despite the fact it did not expressly incorporate conclusions by doctors that the claimant was "moderately limited" in her ability "to perform at a consistent pace without an unreasonable number and length of rest periods").

The facts in this case are similar to those in Stubbs-Danielson and McArthur. Despite Dr. Warren's finding that Plaintiff had moderate limitations regarding his ability to work a full day or week and maintain "concentration, persistence or pace" without an unreasonable number and length of rest periods, Dr. Warren agreed, as did the doctors in Stubbs-Danielson and McArthur, that

Plaintiff retained the RFC to perform simple, repetitive tasks, and endorsed the findings of an examining psychologist on that point, Dr. Engeln. See AR at 221, 210. The Court notes that these findings by Drs. Warren and Engeln were incorporated by the ALJ in his RFC finding, wherein he limited Plaintiff to work requiring him to "carry out only simple one- or two-step job instructions."[7] Based on this RFC Assessment, the VE concluded that Plaintiff could work. See AR at 64-65. The Court concludes that this RFC finding was supported by Dr. Warren's ultimate opinion, the opinions of examining psychologist Dr. Engeln and the other consulting experts such as Drs. Muro and Murrillo.[8] Therefore the ALJ's finding regarding Plaintiff's RFC was not error. Id. at 64, 210, 221, 234, 236-38, 261-62.

B. The ALJ Did Nor Err in Failing to Specifically Include Plaintiff's Mental Retardation in Hypotheticals Presented to the VE

At the administrative hearing, the ALJ asked the VE to consider a hypothetical involving someone of Plaintiff's age, education, and work experiences who could "understand, remember and carry out simple one or two-step job instructions." AR at 64. In response, the VE opined that such a person could perform certain of Plaintiff's past relevant work, in particular industrial and commercial cleaner, and other work in the national economy, including poultry offal icer, termite exterminator helper and brush-clearing laborer. Id. at 64-65. The ALJ later adopted this RFC finding and, citing the VE, noted that Plaintiff could perform the work outlined by the VE and was, therefore, not disabled under the Act. Id. at 18, 24, 25.

Plaintiff appears to contend that the ALJ committed reversible error in failing to incorporate the fact that Plaintiff was either borderline or mentally retarded in this hypothetical, thereby rendering the VE's conclusions concerning Plaintiff's ability to work unreliable. (Doc. 14 at 10). See Bray v. Commissioner of Social Security Adminstration, 554 F.3d 1219, 1228 (9th Cir. 2009) (noting that if an ALJ's hypothetical does not reflect all of a claimant's limitation then an expert's

---

[7] In his brief, Plaintiff agrees that "[t]he ALJ correctly analyzed the presence of moderate limitations in performing detailed work as limiting Harry McKenzie to simple one- and two-step instructions." (Doc. 14 at 9).

[8] As noted in his decision, this RFC was supported chiefly by Dr. Engeln's opinion that Plaintiff' impairment limited him to work involving no more than simple repetitive tasks. See AR at 19, 210.

13

testimony has no evidentiary support to a finding that the claimant is capable of performing work in the national economy).

Plaintiff cites two cases from the Eighth Circuit to support his claim that the ALJ erred in failing to incorporate Plaintiff's mental impairment into the hypothetical posed to the VE that formed a basis for the ALJ's finding that Plaintiff was not disabled. See Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997) ("borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert"); Pickney v. Chater, 96 F.3d 294, 296-97 (8th Cir. 1996) ("the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole").

On the other hand, in Howard v. Massanari, 255 F.3d 577 (8th Cir. 2001), another Eighth Circuit case cited by Defendant, the court held that "[b]y incorporating in the RFC the qualification that Howard is only capable of performing simple, routine, repetitive tasks, the ALJ properly accounted for [the claimant's] borderline intellectual functioning, a nonexertional impairment." Id. at 583. As in Howard, the ALJ here accounted for Plaintiff's impairment by noting he was restricted to "simple and repetitive tasks" involving "simple one- or two-step job instructions." See AR at 18, 19. More importantly, in Machado v. Astrue, 2009 WL 790000 (E.D. Cal. March 23, 2009), the court expressly rejected the "one line" statement in Lucy relied on by Plaintiff and declined to adopt "a bright line rule that whenever a claimant has [borderline intellectual functioning] the ALJ cannot make findings regarding RFC without first presenting such a mental impairment to the vocational expert for his or her consideration in determining Claimant's job prospects." Id. at *12.

The Court finds the holdings in Howard and Machado to be persuasive and concludes that, under the circumstances, the ALJ's failure to include Plaintiff's specific mental impairment into the hypothetical posed to the VE and subsequently incorporated into his RFC finding was not error.

### C. The ALJ Properly Discounted the Opinions of Treating Experts and His Conclusion that Plaintiff Retained the RFC to Perform Past Relevant Work and Other Work in the Economy Was Supported by Substantial Evidence

Although not entirely clear from his brief, Plaintiff appears to contend at a more basic level that the ALJ failed to properly consider evidence from treating doctors that his mental impairments,

in particular the evidence of mental retardation, required a finding that he could not work.

Dr. Ensom diagnosed Plaintiff with depressive disorder with psychosis, mental retardation and noted an extremely low GAF score of only 5. AR at 267, 269. A GAF score of 5 denotes an individual who is a persistent danger of severely hurting himself or others (e.g., recurrent violence) or has persistent inability to maintain minimal personal hygiene or has committed a serious suicidal act with clear expectation of death. DSM-IV at 34. Nevertheless, Dr. Ensom's treatment plan did not treat Plaintiff as having this low level of functioning given that he prescribed several prescription medications that were virtually identical to those previously prescribed and recommended nothing more than monthly follow-up visits. See id. Moreover, Dr. Banerjee also diagnosed depressive disorder both with and without psychosis. See AR at 241, 244, 250, 253, 259-60, 270, 272, 273. However, she documented much different GAF scores (40-45) and made no specific finding regarding mental retardation. See id.

The opinions of treating doctors are given more weight than the opinions of non-treating doctors. If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); see also Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). Even if contradicted by another doctor, the Commissioner may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830.

Upon review, the Court believes that the ALJ presented specific and legitimate reasons for discounting the findings of Drs. Ensom and Banerjee supported by substantial evidence in the record. First, he noted that neither doctor made specific findings concerning Plaintiff's ability to perform work. Conversely, he noted that Dr. Engeln and three non-examining consultants believed that Plaintiff was capable of performing simple, repetitive tasks involving only simple one- or two-step job instructions. See AR at 210, 221, 234, 236-38, 261-62.

Dr. Engeln performed a battery of mental functioning tests upon Plaintiff in August 2006. AR at 208-09. As noted by the ALJ, although these tests indicated some signs of mild and even moderate mental retardation, including IQ scores in the 50s, other measurements documented higher

levels of functioning (borderline/low average).  More importantly, as noted by the ALJ, Dr. Engeln found that the more restrictive findings were not reliable, citing his own impression of Plaintiff during the interview and prominently noting that other tests, in particular the Rey 15 Item Memory Test II and the Test of Memory and Malingering ("TOMM") were positive for exaggeration.  See id. at 19, 209-10.  In other words, Dr. Engeln's report raised serious questions as to whether Plaintiff was exaggerating his symptoms and malingering.  See id. at 208-10.  As a result, Dr. Engeln concluded that testing indicating retardation "appears to be underestimates of his abilities" because Plaintiff "did not appear to be willing to demonstrate the full array of his competency."  Id. at 209.  Two of the non-examining consultants, Drs. Warren and Murrillo, expressly noted and agreed with these findings.  Id. at 221, 234.  Finally, each of these doctors and Dr. Muro, despite noting limitations, concluded that Plaintiff retained the ability to perform simple repetitive work involving simple one-to-two-step job instructions.  Id. at 210, 221, 234, 238, 262.

The ALJ also noted discrepancies and inconsistencies in the more restrictive findings of the treating doctors, in particular, Dr. Ensom.  Among these inconsistencies were differences in the GAF scores reported by Drs. Ensom (5) and Banerjee (scores in the 50s and 40s).   The ALJ concluded that if Dr. Ensom believed Plaintiff's GAF of 5 was accurate (suggesting he was a persistent danger of severely hurting himself and others) "[i]t is unlikely [he] would have allowed a patient with an actual GAF of 5 to leave the building that day."  AR at 21.  Given that Plaintiff was simply prescribed continuing medication and told to return for follow-up appointments a month or two later, the Court agrees with the ALJ's conclusion that "the County doctors were not terribly thorough in Mr. McKenzie's case."  See id.  Finally, the ALJ also noted that Dr. Ensom himself was frustrated by Plaintiff's inability to provide any meaningful background information, noting that this made any clinical assessment difficult.  See id. at 269.  Dr. Ensom's concern supports clinical evidence documented by Dr. Engeln indicative of exaggeration and possible malingering which Dr. Engeln believed may have inaccurately skewed testing of Plaintiff's mental capabilities.[9]  Id. at 21, 208-10.

---

[9] The ALJ also found that Plaintiff's testimony concerning the severity of his symptoms was not credible and offered an extended basis for this finding, noting numerous inconsistencies in his testimony and assertions.  See AR at 21-23.  Plaintiff has not specifically challenged the ALJ's credibility finding and therefore the Court declines to address

In sum, the ALJ articulated specific and legitimate reasons for discounting the opinions of certain treating experts, in particular Dr. Ensom, concerning the severity of Plaintiff's mental impairments. See Magallanes v. Bowen, 881 F.2d 747, 751 ("The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.") In addition, in detailing and outlining the findings of Dr. Engeln and other non-examining experts, the ALJ provided substantial evidence to support his finding that Plaintiff was capable of performing work despite his mental impairments and was, therefore, not disabled.

**CONCLUSION**

The Court concludes that substantial evidence in the record supports the ALJ's RFC finding and his conclusion that Plaintiff retained the ability to perform certain past relevant work and other work in the state and national economy and was, therefore, not disabled within the meaning of the Act.

1. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.
2. The Clerk of Court IS DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff.

IT IS SO ORDERED.

Dated: __March 19, 2010__         /s/ Jennifer L. Thurston
                                  UNITED STATES MAGISTRATE JUDGE

---

this issue on appeal. See Sandgarthe v.Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam) (holding that when an issue is not raised before the district court, it has been waived on appeal to this court).

17